IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TONY GENE LANG, TIMOTHY KEITH WILLIAMS, JOHN MICHAEL TAYLOR, EDWARD WALSTON, JUSTIN ADAMS, CAMERON ADAMS, MATTHEW UTSEY, MICHAEL PATTERSON, JOSHUA DIAMOND, THOMAS LASSITER, JOSHUA ODOM, and BENJAMIN HOVEN, III individually and on behalf of all inmates in the Washington County Jail in Chatom, Alabama,<br><br>        Plaintiffs,<br><br>v.<br><br>WASHINGTON COUNTY, ALABAMA; BRAD JOHNSTON, ALLEN BAILEY, WILLIAM BEASLEY, JASON BOOTHE, JOSEPH ABSTON, in their official capacities as Washington County Commissioners; RICHARD STRINGER, in his official capacity as Sheriff of Washington County, Alabama<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

## I.    INTRODUCTION

1.        Plaintiffs bring this class action on behalf of all inmates who have been, are now, or in the future will be imprisoned in the Washington County Jail in Chatom, Alabama (hereinafter "Jail").  Plaintiffs challenge the inhumane conditions of confinement and treatment that they suffer at the Jail as a result of: inadequate medical and mental health care; a lack of any system for classifying inmates; a lack of exercise, fresh air, or sunlight; exposure to a variety of grave fire hazards; subjection to oppressive and uncivilized levels of sanitation,

cooling, heating, and artificial lighting; inadequate security in the Jail; insufficient diet and
nutrition; lack of access to legal materials; inaccessible facilities posing barriers to the disabled
and infirm; and other serious deficiencies set out in this Complaint.

2.      The named Plaintiffs individually and on behalf of the Plaintiff class seek
declaratory and injunctive relief against Defendants on the grounds that conditions and treatment
of persons confined in the Jail deprive Plaintiffs and the Plaintiff Class of the rights secured to
them by the Eighth and Fourteenth Amendments to the United States Constitution, the
Americans with Disabilities Act of 1990 (ADA) and Section 504 of The Rehabilitation Act of
1973 (Section 504), as well as the rights guaranteed to them by various provisions of Alabama
law.

## II.    JURISDICTION

3.       This suit is brought under the Eighth and Fourteenth Amendments to the United
States Constitution, as enforced through 42 U.S.C. § 1983.  Jurisdiction over Plaintiffs'
constitutional claims, ADA claims, and Section 504 claims is conferred on the Court by 28
U.S.C. §§ 1331 and 1343(3).  Supplemental jurisdiction over Plaintiffs' state law claims is
conferred on the Court by 28 U.S.C. § 1367.

4.      The court is authorized to grant declaratory and injunctive relief by 28 U.S.C. §§
2201 and 2202.

## III.   VENUE

5.      The Southern District of Alabama is an appropriate venue for this action under 28
U.S.C. § 1391(b)(1), because Defendants Washington County, Alabama, Brad Johnston, Allen
Bailey, William Beasley, Jason Boothe, Joseph Abston, and Sheriff Richard Stringer, in their
official capacities, reside in this district.  See also 28 U.S.C. § 1392(a).  It is also an appropriate
venue because a "substantial part of the events or omissions giving rise to the claim[s] occurred"

in this district.  28 U.S.C. § 1391(b)(2) .

## IV.   PARTIES

6.     Plaintiff Tony Lang (Lang) has been housed in the Jail since May 18, 2020. Lang was housed on both large male cell blocks, the "Chatom side" and the "Mobile side" of the Jail, as well as the one-man solitary cell.

7.     Lang is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

8.     Lang suffers from depression and ADHD for which he is not able to access medication in the Jail.

9.     Lang is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and, if necessary, to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

10.     Plaintiff Timothy Williams (Williams) has been housed in the Jail since December 17, 2021.

11.     Williams is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

12.     Williams has asthma and no access to a control inhaler or any other asthma medications in the Jail. The Jail is not equipped to offer him assistance  if he were to experience a respiratory crisis and therefore could not protect him if such a crisis were to occur.

13.     Williams is a "disabled" individual under the ADA and a "qualified individual

with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

14.     Plaintiff Edward Walston (Walston) has been housed in the Jail since November 16, 2021.

15.     Walston has a hernia for which he has been unable to access treatment and a suspected diagnosis of posttraumatic stress disorder (PTSD) following his service in the Iraq War. He has made numerous requests to see a psychiatrist but has not yet seen one because all of his requests for psychiatric treatment have been ignored by jail staff.

16.     Walston is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

17.     Walston is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504. He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

18.     Plaintiff Justin Adams (Adams) has been housed in the Jail since October or November 2021.

19.     Adams has chronic gastroesophageal reflux disease for which he must take daily control medication to avoid severe pain and other complications. He was not able to access that medication for more than a month even though his wife had brought it to the jail; staff simply failed or refused to give it to him. When Adams inquired of a jailer whether he could finally get

his medication, she told him, "I don't care, I hope you die."

20.     Adams is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

21.     Adams is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504. He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

22.     Plaintiff Cameron Adams (Adams) has been housed in the Jail since December 7, 2021.

23.     Adams has ADHD and bipolar disorder for which he takes daily medication when he is outside the Jail. The Jail will not provide him with this medication.

24.     Adams additionally has an abscessed tooth which is causing him severe pain and facial swelling, and which puts him at significant risk of serious complications if it is not treated. He has not been given so much as ibuprofen, much less any meaningful medical attention.

25.     Adams is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

26.     Adams is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

27.     Plaintiff Matthew Utsey (Utsey) has been housed in the Jail since on or around January 7, 2022.

28.     Utsey has a substance use disorder for which he has requested attention and assistance, but his requests have been ignored.

29.     Utsey also suffers from symptoms of posttraumatic stress following a previous period of incarceration, but has not been able to see a mental health professional. He has made requests for mental health treatment, but those requests have been ignored.

30.     Utsey is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

31.     Utsey is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

32.     Plaintiff Michael Patterson (Patterson) has been housed in the Jail since on or around August 11, 2021.

33.     Patterson has previously been diagnosed with paranoia and anxiety, and has recently begun experiencing auditory and visual hallucinations. When outside the Jail, he takes Vistaril and Remeron for his mental health symptoms.

34.     Patterson is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

35.     Patterson is a "disabled" individual under the ADA and a "qualified individual

with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

36.     Plaintiff Joshua Diamond (Diamond) has been housed in the Jail since on or around November 16, 2021.

37.     Diamond is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

38.     Plaintiff John Michael Taylor (Taylor) has been housed in the Jail since January 2022.

39.     Taylor is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

40.     Plaintiff Joshua Odom (Odom) has been housed in the Jail since on or around October 17, 2021.

41.     Odom is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

42.     Plaintiff Thomas Lassiter (Lassiter) has been housed in the Jail since on or around June 3, 2021.

43.     Lassiter is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

44.     Plaintiff Benjamin Hoven III (Hoven) has been housed in the Jail since on or around September 16, 2021.

45.     Hoven has a condition, catatonia, which stems from posttraumatic stress following previous periods of incarceration and related depression. Hoven frequently has catatonic episodes where he "locks up" for multiple days at a time and, although he is fully mentally aware of himself and his surroundings, he cannot speak, eat, or move.

46.     Jail staff are aware of Hoven's condition but make no effort to intervene or assist him when he has catatonic episodes. Instead, other inmates watch over Hoven to ensure that he is safe until he regains control of himself.

47.     Hoven is supposed to be taking Zyprexa and Trazodone for his condition, but cannot access it in the jail. His family cannot bring him medications because his prescriptions are expired and cannot be refilled. He has not been permitted to see a doctor on the outside to get the prescriptions renewed.

48.     Hoven is subject to the policies and practices of the Jail and Washington County, Alabama, which in turn subject him to inhumane conditions as listed in Paragraph 1 of this Complaint.

49.     Hoven is a "disabled" individual under the ADA and a "qualified individual with a disability" under Section 504.  He is entitled to the benefits of the services, programs, or activities of the Jail without discrimination and if necessary to any reasonable accommodations required to allow for his use of said services, programs, or activities, as guaranteed by those statutes.

50.     Defendant Washington County, Alabama is sued as the government entity responsible for properly maintaining and operating the Jail.  *See* Ala. Code §§ 11-12-15(a)(1), 11-14-10, 11-16-28 (1975).

51.     Defendant Washington County Commission is the local unit of government that maintains the Washington County Jail.  It is a recipient of Federal funds and is also an instrumentality of a local government; as such, it is a covered entity subject to the provisions of Title II of the ADA and Section 504.

52.     Defendants Brad Johnston, Allen Bailey, William Beasley, Jason Boothe, and Joseph Abston are sued in their official capacities as members of the Washington County Commission.  The Commission exercises authority over the Jail and is obligated under Alabama law to properly maintain and fund the Jail.  *See* Ala. Code §§ 11-12-14, 11-12-15(a)(1), 11-14-9, 11-14-10, 11-14-20, 11-14-22, 11-16-28, 14-6-20, 14-6-41(b), 14-6- 81, 14-6-92 and 14-6-93, 14-6-96, 14-6-105 (1975).

53.     Defendant Richard Stringer (Stringer) is sued in his official capacity as sheriff of Washington County, Alabama.  As sheriff,  Stringer oversees the general operation of the Jail. He is also charged by Alabama law with the duties of operation of the Jail and properly maintaining it and caring for its prisoners.  *See* Ala. Code §§ 11-41-21, 11-16-29, 14-6-1, 14-6-17, 14-6-19, 14-6-40, 14-6-94, 14-6-95, 14-6-96, 14-6-97, 14-6-105 (1975).

## V.     CLASS ACTION ALLEGATIONS

54.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), the named Plaintiffs bring this action on behalf of themselves and all other persons who have been, now are or, in the future will be incarcerated in the Jail.

55.     The named Plaintiffs representing the disability subclass bring this action on behalf of themselves and all other individuals with disabilities who have been, now are, or will in the future be incarcerated in the Jail.

56.     The class is so numerous that joinder of all members is impracticable.  The Jail should hold no more than 69 inmates but is often at or above capacity.  The population fluctuates daily as inmates are detained, committed, transferred or released.  During the course of each year, therefore, hundreds of inmates are housed at the Jail.

57.     There are questions of law and fact common to the class.  These include the character and constitutionality of the conditions and treatment to which inmates in the Jail have been subjected.

58.     There are questions of law and fact common to the disability subclass. These questions include the nature of any disability-related discrimination and whether the Jail has failed to accommodate those inmates who have disabilities.

59.     The conditions and treatment challenged in this action apply with equal force to the named Plaintiffs and all members of the class so that the claims of the named Plaintiffs are typical of those of the Plaintiff class.

59.     The conditions and treatment of inmates with disabilities challenged in this action apply with equal force to the named Plaintiffs and all members of the disability subclass so that the claims of the named Plaintiffs are typical of those of the disability subclass.

60.     The named Plaintiffs will fairly and adequately represent the interests of the class and the disability subclass. They possess the requisite personal interest in the subject matter of the lawsuit and are represented by counsel experienced in class action litigation involving jail and prison conditions.

61.     Defendants have acted and refused to act on grounds generally applicable to the class and to the disability subclass, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## VI.    FACTUAL ALLEGATIONS

62.    The Jail is located on the upper floor of the Washington County courthouse in Chatom, Alabama.

63.    The Jail consists of six eight-person cells, three on the "Mobile side" and three on the "Chatom side," one eight-person cell in which women are confined, a cell for four people (currently housing females), a one-person "lock-up" cell, and a trustee cell for four men.  One side of the Jail is the "Mobile side" for inmates from or on the way to State prison.  The other side is the "Chatom side" for inmates awaiting trial or serving sentences in the Jail.  Each "side" consists of three eight-man cells and a day room.  A cell is approximately 15 feet by 10 feet.

64.    The Jail was constructed in 1964 to house under sixty (60) inmates; however, the number of inmates which the Jail can confine safely and humanely in accordance with constitutional standards is substantially less than what its design capacity contemplated.  The Jail now typically houses some eighty (80) detainees.  More recently, the Jail's overpopulation has been exacerbated by the transfer and new admission of all inmates from Choctaw County, Alabama because of the permanent closure of its jail.

65.    The Jail is used to house both men and women. It is used to incarcerate individuals upon arrest and prior to trial. It is also used to incarcerate persons convicted of crimes, awaiting sentencing, serving their sentences at the Jail or awaiting transfer to a State correctional facility.

66.    The Jail houses individuals with varying criminal histories, including but not limited to pretrial detainees, convicted inmates who are first offenders, misdemeanants, felons, and work release inmates.  Individuals charged with or convicted of nonviolent crimes and individuals charged with or convicted of violent crimes are confined together.

67.    Presently, and at any given time, there are inmates serving State prison sentences

11

at the Jail.  All or most of these prisoners have had their Court commitment papers completed and sent to the Alabama Department of Corrections (ADOC) and thus are ready to be transferred to an appropriate State Correctional Facility.  One former inmate, Kevin Logan, was held in the Jail for 1½ years after sentencing.

68.     A number of these inmates have been and will continue to be incarcerated in the Jail for months or years even though the Jail is intended for short-term confinement.  A number are serving, or will serve, their entire State prison sentences  there.  Some Trustees serve their sentences of many years in the jail, ostensibly to provide the Jail services.

69.     Many of the inhumane conditions described in this Complaint are caused or exacerbated by the presence of the significant number of inmates serving state prison sentences. State prisoners also occupy already-overcrowded bed space and living space, which could otherwise be allocated to county prisoners who are properly incarcerated in the Jail.  Finally, confinement of state prison inmates in the Jail, particularly for long periods of time, makes it difficult to properly classify and segregate such inmates according to the seriousness of their charge, security risk or their needs.

70.     The Jail houses inmates with disabilities and/or who have other special needs, including inmates who are physically or mentally ill, suicidal, intoxicated, and chemically dependent.  There is no medical cell nor any cell available for use as a medical cell.  There is no cell designed to protect inmates who are at risk of harming themselves.  To the contrary, all the cells provide ample means by which a suicidal inmate could injure or kill themselves or others. There is no policy or training for suicide-risk identification, observation or management.

71.     Persons detained or incarcerated at the Jail spend anywhere from several hours to over a year confined there.  A substantial number of the Jail's present inmates have been incarcerated there for periods greater than six months.

72.     All inmates, except trustees and those on work release, are confined to the Jail twenty-four (24) hours a day, seven (7) days a week, for the duration of their confinement. Prisoners are allowed outdoors on a limited basis, never more than once a week, and often no more than two or three times a month, and thus have no means of getting exercise, fresh air, or sunlight.  Inmates eat, sleep, use the toilet, shower, receive visits (by kiosk), and engage in whatever other activities they can in the cells or dayroom.  From November 21, 2021 to at least December 17, 2021, no inmate was permitted any outdoor access.

73.     The Jail has no facilities for indoor exercise.  The cells have eight bunks, four on each side of the cell running the length of the wall.  Wedged between the bunks on one side of the cell is a toilet and sink.  The doors are always unlocked, and the inmates can move from the cells to the dayroom by way of a small hallway.  The hallway and dayroom are not even large enough to allow inmates to move about, much less allow indoor exercise even if the Jail were below capacity.

74.     The inmates in the solitary lock-up cell are never allowed out of their cell.  They are not even allowed in the small hall in front of the cell.  The cell has no room for exercise.

75.     Most inmates must sit or lie idle in their cells all day.  Inmates confined in this manner suffer deteriorating physical and mental health, including headaches, stiffness, back pain, and a heightened level of tension. The heightened tension leads to frequent violence, which the limited Jail staff makes no effort to mitigate.

76.     Visitation is limited and must be approved.  No place is provided to sit, and conversations are easily overheard by other inmates if the kiosk is used.  No accommodations are made for extending visitation periods for inmates with visitors who must travel long distances to see them .

77.     Prisoners sleep on thin mattresses, placed on top of metal bunks, stacked two beds

high.  The mattresses are not cleaned, disinfected or repaired between users. They often smell and are torn, exposing the stuffing and making it impossible to effectively clean them even if cleaning were attempted.

78.     When the population exceeds the number of beds, as is often the case, inmates must place their mattresses on what little floor space exists in the dayrooms to accommodate additional inmates.  When a mattress is put on the floor, there is little floor space left.  The dayroom floor is often wet from the leaking toilet.  The Jail is chronically overcrowded, especially on weekends, rendering the dayroom useless as inmates are forced to use the floor for sleeping space and the dayroom as living space. Inmates have even resorted to sleeping on tables when there is no more room on the floor.

79.     No place is provided for inmates to store their property, forcing them to set up makeshift storage areas or stuff items under beds, between beds, or wherever they can find room. This contributes to the overcrowding that already exists due to the people, bunks, toilet, and sink that take up the small cell space. This also makes it difficult, if not impossible, for inmates to secure their personal property.

80.     There is little or no sunlight in the living areas of the Jail.  The windows in the hallway outside the Chatom side cells are covered with metal sheeting and bars that block most direct light from reaching the cells themselves.

81.     The artificial lighting in the living area of the Jail is inadequate.  Electrical lighting in the cells is sparse and dim, making reading and writing virtually impossible, and causing inmates who try to read or write to suffer headaches and severe eyestrain.

82.     Inmates and others in the Jail confront a variety of grave fire hazards.  There are no policies or procedures to respond to a fire or other emergencies, no drills or instructions. There is normally only one jailer on duty in the Jail, and even then, jailers are not present and do

not patrol the sections of the Jail occupied by the inmates.  For many hours every day, supervision of the Jail is delegated to inmate Trustees.  There is no two-way communication system or other effective means by which inmates can notify the staff of a fire or other emergency.  Neither Jail staff nor prisoners or trustees have been instructed on procedures to follow in the event of a fire.  Because each side has a door that must be manually unlocked, the lone jailer would not have time to safely evacuate the prisoners if a fire occurred.  There are no manual fire alarms or emergency lights. There is only one exit from the living areas of the Jail, and it is extremely distant from some of the cells.  There are too few, if any, working smoke detectors, fire extinguishers, and artificial breathing devices.  There is no sprinkler system. The actual fire escape has been welded shut.

83.    The cell areas of the Jail are unventilated.  There is no source of fresh air.  The lack of ventilation and the resulting stagnant air in the Jail often cause coughing and headaches, making it difficult for some inmates to breathe, and is otherwise harmful to the prisoners' health. Detainees get sick over and over due to stale air.

84.    The temperature of the Jail is not adequately maintained.  There is purportedly a system for cooling or allowing fresh air into the cells in the summer, but it is not consistent and not effective.

85.    Plumbing in the Jail is unsanitary and in terrible disrepair.  Each side contains only one shower, which must be shared by as many as thirty (30) or more inmates.  The showers are painted metal.  The paint has nearly worn away exposing rusty walls and floors.  The shower walls and other areas are covered with mold and mildew several inches thick and several feet high.

86.    The cell toilet sits inches away from, and at the same level as, the bottom bunks, an arrangement which is unsanitary and denies inmates any privacy.  Because of the cells'

cramped arrangements, prisoners in the beds farthest from the cell doors have the choice of sleeping with their faces inches from either the toilet on one side, or a fellow inmate's feet on the other.

87.     Defendants do not ensure that the toilets, showers, sinks or cell areas are adequately cleaned or disinfected, nor do they provide inmates with adequate supplies for cleaning.  Detainees are provided only a mop, a bucket of cold water and mild detergent, a broom and dustpan.

88.     The cells in the Jail are extremely filthy and unsanitary.  The floors, walls, beds, tables, windows and screens are covered with accumulated layers of dirt, mildew, rust, and peeling paint.

89.     Defendants do not provide inmates with such basic essential personal hygiene items as toothbrushes and toothpaste, shampoo or deodorant.  Defendants provide only small body wash containers.  Detainees' family members are not allowed to bring these supplies and detainees are forced to purchase them in the Commissary at inflated prices.  Inmates may or may not be given blankets, sheets, towels or wash cloths on the day of their arrival.  Blankets given to the inmates are not laundered between users and are dirty and unsanitary.

90.     Grossly inadequate staffing threatens inmates' safety and security daily.  Only one guard is generally assigned to the night shift.  At times, no guards are on duty.  Even two guards on duty, however, do not provide staffing adequate to protect inmates from an unreasonable risk of harm.  While closed circuit monitors are set up in the hall, they often do not function.  The one on the Mobile side has not worked since April 2021, at least.  In order to monitor activity in the cell, a guard must walk down each of the four separate corridors in which inmates are housed. Even two guards walking the hall is inadequate, as explained below.

91.     Even with a guard on the hall, not all cells can be observed at once because of the

outdated linear design of the Jail.  The guard must stand directly in front of the cells to see

inside.  Even standing directly in front of the cell, guards cannot see into the dimly lit cells,

particularly in the evening.  These conditions put both the inmates and the guards at risk.  Fights

occur in cells  regularly and frequently.  Many inmates are beat up and stabbed.  The jail was

shut down in November 2021, when detainee Gary Weaver, was stabbed with a piece of wire.

      92.    There is no regular patrol of the cells by the jailers.  Jailers frequently spend their

entire shift without once entering the cell areas.  Prisoners summon a jailer by yelling through

the dayroom wall.  No call button or other means of emergency communication is provided.

Jailers routinely ignore or wait hours to respond to shouts from the cells that there is some

problem or emergency requiring their assistance.  Delays in response have resulted in unchecked

fights, inmate deaths and medical emergencies.  When staff do respond, they are always delayed

and appear with so few guards as to be unable to effectively intervene in emergency situations.

      93.    Inmates at the Jail are endangered on a daily basis as a result of the Jail staff's

lack of training. Numerous incidents have occurred that should have put  Defendants on notice of

serious breaches in Jail security and medical crises that needed to be addressed, but Defendants

have failed or refused to take any measures to correct these known deficiencies.  No change in

policy or procedure has occurred after repeated medical and other hazard crises.

      94.    Shakedowns are rarely performed by the Jail staff and those that are performed

are not thorough, leaving inmates and portions of the living areas of the jail unsearched.  Jailers

leave to the inmate-trustees the task of observing and monitoring contraband and weapons.

Inmates at the Jail are endangered on a daily basis as a result of the delegation of many jailer

functions to untrained inmate trustees.  In the past, keys to all cells have been entrusted to

trustees, even to deliver prescriptions.

      95.    Jailers rely heavily on trustees to prepare and deliver food and medication to

inmates, to respond to prisoners' calls for assistance, and to perform various other tasks that require entrance into the cell areas.  Further, they give inmate trustees authority over other inmates.

96.     No criteria, policy or procedure exist for selecting inmates for trustee status; rather, Jail officials select trustees without rational criteria.  Both violent and non-violent offenders have been trustees.  Trustees receive greater privileges than other inmates, including contact visits, more living space, and freedom to move about the Jail, courthouse or surrounding area.

97.      Inmates' safety and security is endangered on a daily basis due to the absence of any system for classifying inmates, proper facilities and procedures for separating and housing inmates, and other factors herein described.

98.     The Defendants do not classify inmates admitted to the Jail.  Thus, they neither identify any special needs the inmates have, nor identify or separate prisoners who pose a risk to themselves or others.  Violent inmates have been housed with other inmates and have threatened and assaulted other inmates.  Intoxicated inmates have been housed with other inmates and have threatened or assaulted other inmates or been threatened and assaulted by other inmates.  Inmates with capital murder charges are housed with inmates who have traffic offenses.

99.     Other than the one-person cell, no space exists for segregating inmates who present disciplinary problems or pose a risk or threat to other inmates and there is no meaningful segregation based on these criteria.

100.     Suicidal inmates are housed with other inmates.  Mentally ill inmates have been housed with other inmates, screaming and threatening other inmates.  Requests to jail staff to remove such inmates from the cell have been ignored.  No cell at the Jail is designed to house such inmates. Failure of staff or designated trustees to watch and make sure that inmates take

prescribed medication also allow inmates to stockpile medication which can be used for overdoses. The cells and facilities provide a whole host of methods by which inmates may attempt suicide, including a variety of fixtures from which inmates can hang themselves with ropes made from a ready supply of items, as well as electrical wiring and water by which they can electrocute themselves. One inmate attempted suicide by hanging himself with a telephone cord; staff did not respond to the emergency for more than five minutes, by which time other inmates had already removed the phone cord from the inmate's neck, and the inmate was unconscious and had defecated and urinated on himself.

101.    Prisoners entering the Jail are not subjected to adequate health screening.  No policy or procedure exists for assessing the special health needs and problems of newly admitted inmates.  The Jail staff are not trained to assess these needs or problems.  Prisoners with staph infections, lice, crabs, and other communicable diseases have been housed in the general population.  No testing is done for TB, HIV or other infectious diseases like COVID-19.  No physicals are performed.  Mentally ill inmates have been housed in the general population. Prisoners undergoing withdrawal from addictive chemical substances are housed in the general population.  Jail officials have ignored complaints about placement of such special needs inmates in the general population.

102.    The Jail undertakes almost no measures to protect inmates from COVID-19. COVID-positive detainees are brought in and housed with other inmates and no mitigation efforts (such as isolation) are undertaken to ensure COVID-positive detainees do not infect other detainees. COVID vaccines were offered at one point, but are not indicated for individuals who are currently or have very recently been sick with COVID, which many inmates were at the time the shots were provided. Multiple inmates who were displaying COVID symptoms on the day the vaccinations were provided requested that they be tested for COVID; those requests were

refused. Inmates were offered a cigarette as an incentive for getting the vaccine.

103.    Jail officials are not trained to recognize or respond to health problems including situations requiring first aid, mental illness, chemical dependency and suicidal tendencies. Inmates have suffered physical and psychological harm as a result of the inability of such officials to recognize and respond appropriately to their health problems, such as posttraumatic stress disorder.

104.    Jail officials do not provide inmates with prompt medical care necessary to address their serious medical needs.  Jailers with no medical training determine which inmates' requests for medical treatment will receive attention.  The Jail does not employ or utilize any medical professionals, does not conduct medical sick call, does not provide any medical care in any form, and has no system for identifying or treating any medical needs of the inmates.

105.    Medication prescribed by a physician is not distributed as prescribed, particularly when medication is to be dispensed more than one time a day.  Medication normally is dispensed by trustees.  Inmates with prescribed medication must provide their own medication.  Even where inmates are able to have family members bring their medications to the jail, jail staff frequently still fail to provide them to the inmate. Inmates with both physical and mental conditions which require daily maintenance medication go without. Inmates must sign a waiver to go to the hospital to relieve the Jail from paying the bill, in violation of Alabama state law requiring sheriffs to ensure medical care for inmates in their charge.  No system exists for ensuring that inmates take the medication distributed resulting in stockpiles of medication among the inmates.

106.    There is no dental care made available to inmates.

107.    Because of the lack of any system for contacting a jailer in the event of an emergency, inmates in need of immediate attention have to wait for periods as long as several

hours for assistance.

108.   It is the policy of the jail that, when faced with a medical emergency, the staff will attempt to have the inmate sign a "medical bond," i.e. an extra-judicial document that allows the detainee's temporary release from the jail to seek  their own medical treatment.  If the inmate is incapable of executing the "medical bond," staff will contact the inmate's family to pick the inmate up from the jail and handle the inmate's medical needs.  If none of this is possible, the Jail will have the inmate transported to the local hospital only if the inmate has Medicaid or is otherwise insured.

109.   Inmates do not receive a nutritionally adequate diet.  All meals are prepared by inmate trustees.  Meals do not include fresh fruit, fresh vegetables or milk.  The menus are not reviewed by a dietician. The amount of food inmates receive is wholly inadequate. A typical meal may consist of two (2) hot dogs and four (4) potato wedges, or a peanut butter sandwich and a bologna sandwich served together. Inmates often do not receive anything to drink with their meals.

110.   Inmates have absolutely no access to a law library or individuals who can provide them with legal assistance, though a law library is located in the building.  Because of this deprivation, inmates have been unable to obtain legal information about their criminal cases, the conditions of their confinement, or other important legal matters.

111.   The Jail has no established disciplinary procedures.  No written rules govern discipline.

112.   All Defendants are, and have for some time been, aware of the inhumane conditions of confinement and treatment of inmates at the Jail as described in this Complaint, (as a result of reports of official inspections of the Jail), constant complaints from inmates, newspapers articles about such conditions and the conspicuousness of such conditions).  In

addition, Stringer and his staff have been sued frequently on many of the same issues raised in this action. These conditions and treatment are the product of deliberate indifference on the part of Defendants.  The conditions of confinement and Defendants' policies and practices in administering and overseeing the Jail, considered both discretely and in their totality, deprive Plaintiffs and the classes they represent of the minimal civilized measure of life's necessities.

## VII.   CAUSES OF ACTION

### Count I
### Inadequate Conditions of Confinement, Inadequate Medical Care, Failure to Protect
(42 U.S.C. § 1983; Eighth and Fourteenth Amendments)

113.    Plaintiffs and the Plaintiff Class reassert and incorporate by reference the allegations contained in paragraphs 1-112 above.

114.    The conditions of confinement at the Jail and Defendants' deliberate indifference to those conditions and their policies and practices in administering and overseeing the Jail, considered both discretely and in their totality, constitute cruel and unusual punishment in violation of Plaintiffs' rights, and those of the classes they represent, under the Eighth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

115.    The conditions of confinement at the Jail and Defendants' failure to remedy those conditions and their policies and practices in administering and overseeing the Jail, considered both individually and in their combination, constitute a denial of due process in violation of Plaintiffs' rights, and those of the classes they represent, under the Eighth and Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983.

116.    Defendants' practice of punishing inmates at the Jail for disciplinary infractions without providing them notice of the charges, a hearing, or other procedural protections, violates Plaintiffs' rights, and those of the classes they represent, to due process under the Eighth and

Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

117.    Defendants' refusal to protect inmates from assault and otherwise keep them physically safe and secure violates Plaintiffs' rights, and those of the classes they represent, under the Eighth and Fourteenth Amendments and to due process under the Eighth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

118.    Defendants' failure to ensure treatment of the inmates' serious medical needs violates Plaintiffs' rights, and those of the classes they represent, under the Eighth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

**Count II**
**Violations of the Rights of Inmates with Disabilities**
(42 U.S.C. §§ 12131, *et seq.*)

119.    Plaintiffs and the Plaintiff Class reassert and incorporate by reference the allegations contained in paragraphs 1-112 above.

120.    Finding that "discrimination against individuals with disabilities" is "a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2), Congress enacted the ADA, 42 U.S.C. §§ 12101 et seq., to provide a clear and comprehensive mandate for the elimination of discrimination against people with disabilities and to provide strong and consistent standards for identifying and remediating such discrimination. 42 U.S.C. § 12101(b)(1)–(2).

121.    Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

122.    The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Individuals who are "regarded as" having an impairment as described above are also considered individuals with disabilities for purposes of the ADA. 42 U.S.C. § 12102(1)(C).

123.    The ADA and its implementing regulations require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 42 U.S.C. § 12134, 28 C.F.R. § 35.130(b)(7).

124.    The regulations also specify that it is unlawful for a public entity to: (a) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others; or (b) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.  See 28 C.F.R. 35.130(b)(1)(ii)–(iii).

125.    Plaintiffs Lang, Williams, Walston, Cameron Adams, Justin Adams, Utsey, Patterson, and Hoven (hereafter "the disability subclass") are qualified individuals with disabilities, as that term is defined in the ADA, and are therefore entitled to the protections of the ADA.

126.    Defendants have denied important services, programs, and activities to Plaintiffs and members of their subclass, solely by reason of their disabilities.

127.    Defendants have not permitted reasonable accommodations for Plaintiffs' disabilities and have discriminated against them and members of their subclass in the provision of programs and services. The disability subclass is therefore prohibited by the policies and practices of the Jail from enjoying the same access to programs and services as inmates who do not have disabilities, in violation of the mandate of the Americans with Disabilities Act and its implementing regulations.

### Count III
### Violation of the Rights of Inmates with Disabilities
(29 U.S.C. §§ 794, *et seq.*)

128.    Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States... shall solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial Assistance." *See* 29 U.S.C. § 794(a).

129.    Under Section 504, a "qualified handicapped person" is a person who, with respect to services outside of the realm of employment, "meets the essential eligibility requirements for the receipt of such services." *See* 28 C.F.R. § 41.32(b). A "handicapped person" for purposes of the Act is "any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such an impairment." *See* 28 C.F.R. § 41.31(a).

130.    The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b).

131.    Defendants receive "federal financial assistance" within the meaning of 28 U.S.C. § 794(a).

132.    Plaintiffs Lang, Williams, Walston, Cameron Adams, Justin Adams, Utsey, Patterson, and Hoven (hereafter "the disability subclass") are qualified individuals with disabilities, as that term is defined in the ADA, and are therefore entitled to the protections of the ADA.

133.    Defendants have denied important services, programs, and activities to Plaintiffs and members of their subclass, solely by reason of their disabilities.

134.    Defendants have not permitted reasonable accommodations for Plaintiffs' disabilities and have discriminated against them and members of their subclass in the provision of programs and services. The disability subclass is therefore prohibited by the policies and practices of the Jail from enjoying the same access to programs and services as inmates who do not have disabilities, in violation of the mandate of the Rehabilitation Act of 1973 and its implementing regulations.

**Count IV**
**Jail Conditions in Violation of Alabama Law**
(Ala. Code §§ 14-6-1, *et seq*.; Ala. Code § 14-3-30)

135.    Defendants have refused to "require that the building and grounds" of the Jail "be kept in the best sanitary condition," in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-81 (1975).

136.    Defendants have refused to remove State-ready inmates from the Jail in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-3-30 (1975).

137.    Defendants' refusal to provide "necessary clothing and bedding ... and also necessary medicines and medical attention" to Plaintiff and the Plaintiff Class violates their rights under Ala. Code § 14-6-19 (1975).

138.    By allowing the Jail to remain "foul or unclean," Defendants have violated Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-21 (1975).

139.    Defendants have refused to regularly and "thoroughly fumigate ... cleanse" and "paint" the Jail, in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-92 (1975).

140.    Defendants have refused to "provide adequate janitor service for" the Jail, "enforce cleanliness" in the Jail, and provide "soap and towels, hot and cold water, clean and sufficient bedding and clean clothes" for inmates at the Jail, in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-93 (1975).

141.    Defendants have refused to keep the Jail "in a clean and sanitary condition" and to "exercise every precaution to prevent the spread of disease among the inmates," in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-95 (1975).

142.    Defendants have refused to "see that the food for the inmates of the [J]ail ... is nutritious, clean, wholesome, and of sufficient quantity and variety" or "to have all kitchens where food is prepared for the inmates adequately screened against flies," in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-97 (1975).

143.    Defendants have refused to ensure that the Jail is "fire-proof, properly ventilated, sufficiently lighted by day and night, adequately heated and contain [s] adequate sanitary plumbing and sewerage connections," in violation of Plaintiffs' and the Plaintiff Class's rights under Ala. Code § 14-6-103 (1975).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the Plaintiff Class, and the disability subclass respectfully pray that this Court:

1.    Assume jurisdiction over this action;

2.    Order that this case may be maintained as a class action pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure;

3.      Declare unconstitutional and unlawful the conditions of confinement and treatment of inmates at the Jail;

4.      Enter a permanent injunction requiring Defendants, their successors, agents, employees, and all persons acting in concert with them to take immediate steps to improve the conditions of confinement and treatment of inmates held by Defendants in Washington County and bring such treatment and conditions to a constitutionally adequate level by ordering the removal of all State-ready inmates from the Jail, housing fewer inmates per cell to allow sufficient square footage per inmates, allowing outdoor exercise and recreation, ensuring that the Jail is reasonably fire-safe, improving ventilation, temperature control and lighting, improving sanitation and food service, providing inmates a safe and secure environment, providing adequate medical, dental and mental health care, maintaining an adequate number of properly trained male and female staff for twenty-four (24) hour supervision of the Jail, implementing a classification and health screening system, allowing meaningful access to the courts, supplying inmates with necessary personal hygiene items, and ordering such other changes in policy, procedure and maintenance of the Jail as may be required to eliminate all unlawful and unconstitutional conditions;

5.      Award Plaintiff costs of this suit and reasonable attorneys' fees;

6.      Order such additional relief as the Court may deem just and proper.

Respectfully submitted this 8th day of February, 2022.

/s/ Henry Brewster
Henry Brewster (BREWH7737)
HENRY BREWSTER, LLC
205 N. Conception Street
Mobile, AL 36603
Phone: 251-338-0630
Email: hbrewster@brewsterlaw.net

/s/ Shandra N. Monterastelli
Shandra N. Monterastelli (MONTS2980)
ALABAMA DISABILITIES ADVOCACY
PROGRAM
2008 12th Street
Box 870395
Tuscaloosa, AL 35487-0395
Phone: (205) 348-4928
Facsimile: (205) 348-3909
Email: smonterastelli@adap.ua.edu

/s/ Martin Weinberg
Martin Weinberg (ASB-0817-A61W)
P.O. Box 154
Shannon, AL 35142
Phone: 205-910-3722
Facsimile: 205-413-8717
Email: attorneyweinberg@bellsouth.net

/s/ David I. Schoen
David I. Schoen (ASB-0860-O42D)
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Phone: (334) 395-6611
Facsimile: (917) 591-7586
Email: Schoenlawfirm@gmail.com

/s/ David Gespass
David Gespass
GESPASS & JOHNSON
40 Echo Lane
Fairhope, AL 36532
Phone: 205-566-2530
Email: pass.gandjlaw@gmail.com

*Counsel for Plaintiffs*